### JOHNSON ET AL. v. BUGLE COAT, APRON & LINEN SERVICE, INC.

[No. 204, October Term, 1947.]

*Decided July 20, 1948.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*H. Mortimer Kremer* and *Jacob D. Hornstein* for the
appellants.

*Willis R. Jones* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree sustaining a demurrer
to a second amended bill for discovery and accounting
and dismissing the bill. As the case is here on demurrer,
the substance of the bill will be stated as facts.

Defendant is engaged in renting, delivering, supplying
and "servicing" table and kitchen linen. It entered into
an agreement (not alleged to be in writing) with plaintiffs
whereby it agreed to rent and deliver to plaintiffs cer-
tain table and kitchen linens, viz., aprons, coats, nap-
kins, mops, towels and table cloths, at specified unit
prices, ranging from 1c each for napkins to 20c each
for large table cloths, in quantities sufficient to meet the
requirements of plaintiffs' restaurant business. Under
the terms of the agreement defendant "agreed to count
and keep all the records of the number and quantity of
each type of linen item rented * * * and to issue state-
ments and account each month for the linens rented" to
plaintiffs "during the previous months." "All the records
concerning the number of linen items rented" to plaintiffs
were and are "under the complete and sole care and
custody" of defendant and "were not and are not avail-
able to" plaintiffs, and plaintiffs "cannot ascertain" the
number through their own efforts. In "ostensible ac-
cordance" with the agreement defendant rendered state-
ments and accounts to plaintiffs purporting to set forth
all the linens rented to plaintiffs to and including No-
vember 30, 1946, which statements plaintiffs accepted
as correct.

On November 30, 1946 plaintiffs discovered through
the "confession" of one of their employees, a stock-clerk,

that he knew statements from about November 1, 1946 to November 24, 1946 were "erroneous and incorrect," not in accordance with the agreement, although plaintiffs had paid defendant "$38,185.01 more or less," the total of the amounts shown on the monthly statements from January 1, 1942, to November 30, 1946. The "confession" states that in October, 1946, defendant's truck driver proposed to plaintiffs' stock-clerk that they each "make a dollar" by charging plaintiffs "for more linen than was really delivered". The driver "said he couldn't overcharge too much or it would be noticeable." On the following Wednesday the stock-clerk agreed to the "idea", but the driver "had already checked out his linens for that day, so we could not overcharge that day. On the following Friday, I signed the slip without questioning his figures, and he gave me a dollar bill after I had signed the slip. This arrangement continued until I went on night work about November 24, 1946, except that we never shorted or overcharged * * * on a Monday. I always checked the number of each type of linens left on Monday after the driver had left. The reason for this was that his deliveries on Monday were small because business was slack on Monday, and I counted them because I had plenty of time. On Wednesday and Friday I was too busy to check on the numbers of linens left, and the quantities were large enough that a shortage probably would not be noticed. Up until about November 24, 1946, the driver gave me a dollar on each Wednesday and Friday. On three different occasions, I counted the linens to see how much the driver was making on the deal on a Wednesday or a Friday. The first time I counted he had overcharged $2.00, the second time was $3.00 and the third was $3.60. I also gave him fifteen pounds of sugar in three five-pound boxes. * * * He agreed to get me some white shirts in return * * * I believe [another employee of plaintiffs] was in on [the "deal"], because when I first went there he always wanted to check the linen, but later he let me check it."

After working hours of this stock-clerk had been shifted to nighttime and he no longer accepted deliveries from defendant's driver and had no further connections with such deliveries, defendant through its driver continued to deliver a smaller quantity than had been ordered by plaintiffs and to bill plaintiffs for the quantity ordered, for which plaintiffs paid in full. Before November 1, 1946, and after November 24, 1946, "no conspiracy of any sort existed" between any employee of defendant and any employee of plaintiffs. Immediately upon discovery that defendant's statements were incorrect, plaintiffs informed defendant of the discovery, offered to pay the cost of employing a detective agency to watch the driver and demanded of defendant correct statements and a correct accounting, but defendant has refused plaintiffs' offer of a private detective and has refused to render true and correct statements as to the quantity of linens actually rented and to account to plaintiffs in accordance with the agreement between plaintiffs and defendant. Plaintiffs, "without changing the number [or] quantity of linen items on order", placed their auditor and two other employees at their receiving room where they observed the delivery of linens on December 2, 4, 6, 7, 9 and 11, 1946. Upon completion of the delivery of December 11th plaintiffs were compelled to cancel further orders of napkins because their storage facilities were overflowing with linens, a situation which has never before developed during their dealings with defendant. No napkins were ordered for or delivered on Friday, December 13th, and on each of the next regular delivery days, December 16th and 18th, 600 napkins were delivered, whereas on December 2, 1946, before plaintiffs "had informed" defendant of their discovery, defendant's "delivery ticket" indicated delivery of 2650, which delivery was observed by plaintiffs' auditor, and plaintiffs are satisfied that the quantity indicated was actually delivered. On subsequent deliveries, after defendant had been told of plaintiffs' discovery of the incorrectness of the statements, the quantity was reduced to 1750, 1550, 1500, 1600 and 1450 on

December 4th, 6th, 7th, 9th and 11th respectively, after which orders for napkins were cancelled until further notice. Plaintiffs "maintain no special machinery, equipment, department or employees for the purpose of determining the accuracy of weights, measures or counting devices used by their suppliers"; it is not plaintiffs' duty to do so; "the supervision of the accuracy of weights, measures, and counting devices is a governmental and not a private function." While the number of customers served by plaintiffs decreased gradually during every month in 1946, the rental charges for linens increased from $953.82 in January to $1248.14 in November and the rental charge for "each category" of linens "increased tremendously."

The bill prays (A) that defendant, on oath, answer the bill and "discover and set forth in detail all amounts and quantities of each type of linen actually rented" to plaintiffs from January 1, 1942, to November 30, 1946, (B) that defendant be decreed to pay over to plaintiffs "a sum equivalent to the agreed value of the services actually rendered" to plaintiffs by defendant on account of their agreements and the amount paid by plaintiffs to defendant on account of the incorrect statements of defendant, and (C) for general relief. With the bill were filed nine interrogatories, elaborating in great detail and expanding the prayer [A] for discovery, and asking not only "the exact number" and date of delivery of each type of linens, "beginning with the date of the first linen rental transaction" between plaintiffs and defendant and "ending with the present date," the "system" whereby defendant "kept account of the number" of items of each type, the names and addresses of defendant's employees who (a) actually recorded all or any such transactions upon books or records of original entry, if any, or (b) "supervise or in any way participate in the responsibility" for such entries "or have done so in the past", with the date when each employee became responsible and relinquished responsibility for such records, or (c) actually counted any such linens or had transmitted to them the

result of such counts for entry upon records, but also the date and amount of each payment made to defendant by plaintiffs, the names of all employees of plaintiffs who saw such delivery of linens, "collating" each delivery with the name of the employees of plaintiffs who saw the deliveries made, and the number of items of each type of linens for which defendant has been compensated by plaintiffs, and the number of items of each type covered by each payment and the rate of compensation for each type.

The principal question presented (which we understand was the basis of the decision below) is whether the bill states a case for relief in equity. It is unnecessary, and it would be unwise, to express any opinion as to the substantive rights of the parties. We may assume, without deciding, that the bill states a case of payments induced by fraud or mistake, and that plaintiffs are entitled to relief in a proper tribunal and are not estopped by conduct (*Hardy v. Chesapeake Bank*, 51 Md. 562, 34 Am. St. Rep. 325) from any recovery. The question is whether a court of equity is a proper tribunal.

"In *Miller's Equity*, § 721, p. 823, it is said (citing *Pomeroy*) : 'The general rule is that a suit in equity for an accounting may be maintained when the remedies at law are inadequate. The instances in which the legal remedies are held to be inadequate are said to be as follows: First, where there are mutual accounts between the plaintiff and the defendant; * * * second, where the accounts are all on one side, but there are circumstances of great complication, or difficulties in the way of adequate remedy at law; and third, where a fiduciary relation exists between the parties, and a duty rests upon the defendant to render an account.' " *Nagel v. Todd*, 185 Md. 512, 517, 45 A. 2d 326, 328; *Pomeroy, Equity Jurisprudence*, 5th Ed., § 1421. Plaintiffs contend that the bill shows a breach of confidential relations, a duty to account, and consequently an independent ground of equity jurisdiction. *Nagel v. Todd, supra.* "A confidential relation is not limited to cases of guardian and ward, attor-

ney and client, and principal and agent, but exists in every case where confidence is reposed by one person and accepted by the other." *Grimes v. Grimes,* 184 Md. 59, 63, 40 A. 2d 58, 61; *Pomeroy, supra,* § 956a.

The relation of laundry and customer, or bailor and bailee, unlike that of guardian and ward, attorney and client, or principal and agent, is not usually a confidential relation, but in a particular case it conceivably may be. Laundries, as well as merchants and banks, have been known to make mistakes. The butcher, the baker and the candle-stick maker do not occupy a fiduciary relation toward every customer who has too much faith in human nature or is too busy or too careless (whichever way he may properly be characterized) to count his change. The bill does not show that in fact confidence was reposed by plaintiffs and accepted by defendant. The alleged agreement to count goods, keep records and issue monthly statements amounts to no more than the usual practice of merchants to render itemized bills. The allegation that plaintiffs "maintain no special machinery, equipment or employees for the purpose of determining the accuracy of weights, measures or counting devices used by their suppliers", is mere verbiage and does not explain or excuse failure to count goods delivered. Their stock-clerk's "confession" shows that detection of errors was so easy that he and the driver were afraid to perpetrate their joint frauds on "slack" days, Mondays [and Saturdays(?)], and confined them to "busy" days, Wednesdays and Fridays, and that on three out of seven of the busy days when they operated together he (not relying on "honor among thieves") actually counted the goods delivered and found an aggregate overcharge of $8.60. The only breach of confidential relations was committed by these two unfaithful stewards, who combined to cheat both plaintiffs and defendant. *Silver Hill Sand & Gravel Co. v. Carozza Corporation,* 184 Md. 226, 228, 40 A. 2d 311, (relied on by plaintiffs), involved no deliveries of goods between the parties but a royalty agreement by which the defendant was obligated to pay royalties on

sand and gravel delivered to third persons and to account to plaintiff accordingly.

Plaintiffs also invoke discovery as an independent ground of equity jurisdiction. Notwithstanding the allegations that plaintiffs "cannot ascertain through their own efforts" the number of linen items rented to them, that before November 1, 1946 and after November 24, 1946, "no conspiracy of any sort existed" between employees of plaintiffs and defendant respectively, but after November 24, 1946, defendant, "through its driver," continued to deliver smaller quantities than ordered and to bill plaintiffs for the quantity ordered, specific facts shown are that deliveries were accompanied by duplicate receipts, stating quantities purporting to be delivered, one (the "slip") signed by plaintiffs' stock-clerk, the other (the "delivery ticket") retained by plaintiffs. These receipts could be checked by plaintiffs for each delivery, and were checked and found correct for December 2, 1946. This leaves only one possible Wednesday and Friday for overcharge by the driver after November 24, 1946, and before discovery by plaintiffs on November 30, 1946. There is no allegation of any overcharge before November 1, 1946, but there is argument suggestive of such overcharges, and the stock-clerk in his "confession" expresses his belief (contrary to plaintiffs' allegation in the bill) in a previous conspiracy between another employee of plaintiffs and defendant's driver. There is nothing to indicate that defendant has or could have any record of its driver's frauds upon both plaintiffs and defendant or any material records or information not already available to plaintiffs from the "delivery tickets" and the itemized monthly statements, which are tabulated by months for 1946 in the bill. The alleged fact that plaintiffs' number of customers decreased while its linen bills increased, and interrogations about plaintiffs' employees, naturally would be within plaintiffs' knowledge, not defendant's, or would be ascertainable only by plaintiffs.

In the circumstances a bill for discovery would seem to be a "fishing expedition" foredoomed to futility. Equity jurisdiction for discovery *and accounting* is not impaired by improved facilities for discovery at law. *Goldsborough v. County Trust Co.,* 180 Md. 59, 61, 22 A. 2d 920; *Nagel v. Todd, supra,* 185 Md. 518, 45 A. 2d 326. But where there is no other ground of equity jurisdiction, a bill for discovery alone has been practically superseded by an adequate, complete and sufficient remedy at law. *Silver Hill Sand & Gravel Co. v. Carozza Corporation, supra; Hill v. Pinder,* 150 Md. 397, 409, 410, 133 A. 134; *Becker v. Frederick W. Lipps Co.,* 131 Md. 301, 306, 307, 101 A. 783.

We need not express an opinion whether this bill would formerly have been within the inherent equity jurisdiction over bills for discovery, or would have been demurrable as a "fishing expedition" or for other reasons. Nor need we express an opinion whether the allegations of the bill state a case for discovery under the present rules of practice and procedure, equally applicable at law or in equity. General Rules of Practice and Procedure, Discovery, pt. 2, subd. 2, Rules 1-8. Without drawing any line as to the allegations in the instant case, it is sufficient that the new rules furnish means for discovery, at law or in equity, which are broader than the former inherent equity jurisdiction. *Hickman v. Taylor,* 329 U. S. 495, 507, 67 S. Ct. 385, 91 L. Ed. 451; *cf. Hallman v. Gross,* 190 Md. 563, 574, 59 A. 2d 304, 308, 309.

*Decree affirmed, with costs.*