36 A.3d 399

Michael T. POLEK, et ux.

v.

J.P. MORGAN CHASE BANK, N.A., et al.

Richard S. Dinnis, et ux.

v.

J.P. Morgan Chase Bank, N.A., et al.

John W. Kinsey, Jr., et ux.

v.

J.P. Morgan Chase Bank, N.A., et al.

Frank J. Schultz, Jr.

v.

Citimortgage, Inc.

Elizabeth A. Moore, et vir.

v.

Residential Funding Company LLC, et al.

Nos. 24, Sept. Term, 2011, 25, Sept. Term, 2011, 26, Sept. Term, 2011, 38, Sept. Term, 2011, 80, Sept. Term, 2011.

Court of Appeals of Maryland.

Jan. 24, 2012.

334

336

E. David Hoskins (The Law Offices of E. David Hoskins, LLC, Baltimore, MD) on brief, for appellants in Case Nos. 24 Sept. Term, 2011, 25 Sept. Term, 2011, 26 Sept. Term, 2011, 38 Sept. Term, 2011, 80 Sept. Term, 2011.

Rebecca J. Coleman, Phillip R. Robinson, Baltimore, MD, for amici curiae Civil Justice, Inc., Maryland Cash Campaign, The Public Justice Center, Maryland Legal Aid Bureau, Inc., and St. Ambrose Housing Aid Center.

Daniel H. Squire (Reginald B. McKnight, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Washington, DC) on brief, for appellees, in Case No. 24 Sept. Term, 2011.

Gerard J. Gaeng (Andrew H. Baida, Rosenberg, Martin, Greenberg, LLP, Baltimore, MD; John S. Simcox, Simcox and Barclay, LLP, Annapolis, MD; LeAnn Pederson Pope, Victoria R. Collado, and Andrew D. LeMar, Burke, Warren, MacKay & Serritella, P.C., Chicago, Illinois) on brief, for appellees in

Case Nos. 24 Sept. Term, 2011, 25 Sept. Term, 2011, 26 Sept. Term, 2011.

Robert A. Scott (Glenn A. Cline, Ballard Spahr LLP, Baltimore, MD) on brief, for appellee in Case No. 38 Sept. Term, 2011.

Gerard J. Gaeng (Rosenberg, Martin, Greenberg, LLP, Baltimore, MD; John M. McIntyre, Reed Smith, LLP, Pittsburgh, PA) on brief, for appellees in Case No. 80 Sept. Term, 2011.

BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

HARRELL, J.

Appellants, Michael T. and Linda Polek, Richard S. and Concetta Dinnis, John W. and Denise Kinsey, Jr., Frank J. Schultz, Jr., and Elizabeth and Alric Moore, appeal dismissals of their respective cases in the Circuit Courts for Baltimore City (the Polek, Dinnis, Kinsey, and Moore cases) and Anne Arundel County (the Schultz case). The claims in these cases are largely identical (except as noted) in that they share similar allegations of violations of the Maryland Secondary Mortgage Loan Law ("SMLL"), the Maryland Consumer Protection Act ("CPA"),[1] and common law breach of contract. Two sets of Appellants, the Poleks and the Kinseys, argue that Maryland Code (1957, 2005 Repl.Vol.) Commercial Law Article, § 12–405,[2,3] allows only a single loan origination fee, rather

---

**1.** Appellants allege unfair or deceptive trade practices under § 13–301(3), which prohibits failure "to state a material facts if the failure deceives or tends to deceive," and § 13–301(9) that prohibits, in relevant part, "deception, fraud, false pretenses, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same...."

**2.** Unless otherwise noted, all statutory references are to the Commercial Law Article of the Maryland Code.

**3.** The relevant portion of § 12–405 states:

than the multiple identified individual fees the borrowers were charged at their respective secondary mortgage loan closings. All Appellants maintain also that they were not provided at closing a mandatory disclosure form required assertedly by § 12–407.1.[4] Three sets of Appellants (the Dinnises, Schultz, and the Moores), who did not retain copies of their loan or closing documents, alleged breach of contract, violation of the CPA, and a claim in accounting when their respective Appellee mortgage companies (assignees of the original lenders) refused to provide them, well after their loans had been paid in full, with copies of the documents. Appellants' basis for the SMLL, CPA, and breach of contract claims is assignee liability

---

(a) *Origination fee.*—(1) A lender may collect a loan origination fee for making a loan under this subtitle only as provided in this section.
(2) The aggregate amount of the loan origination fee imposed by a lender under this section when combined with any finder's fee imposed by a mortgage broker under § 12–804 of this title may not exceed the greater of:
(i) $500 or 10 percent of the net proceeds of a commercial loan of $75,000 or less made under this subtitle; or
(ii) $250 or 10 percent of the net proceeds of any other loan made under this subtitle.
(3) A lender may not collect from the borrower any other commission, finder's fee, or point for obtaining, procuring, or placing a loan under this subtitle. . . .

4. The relevant portion of § 12–407.1 states:
(a) *Commissioner to develop form.*—The Commissioner shall develop and prepare a form that each lender shall furnish to an applicant for a secondary mortgage loan. The form shall state the following:
(1) The purpose for which the loan is to be used;
(2) A disclosure that, if the loan is for a commercial purpose, the borrower shall forfeit certain rights.
(b) *Required explanation of forfeiture of rights.*—The form shall state that the forfeiture of rights includes:
(1) The borrower's right to pay a loan origination fee that, when combined with any finder's fee imposed by a mortgage broker under § 12–804 of this title, does not exceed the greater of:
(i) $500 or 10 percent of the net proceeds of a commercial loan of $75,000 or less made under this subtitle; or
(ii) $250 or 10 percent of the net proceeds of any other loan made under this subtitle;
(2) The borrower's right not to pay any other commission, finder's fees, or point for obtaining, procuring, or placing a loan; and
(3) The borrower's right not to pay an interest rate greater than 24 percent. . . .

and an extended statute of limitations under the SMLL.[5] We conclude that the SMLL does not restrict a lender to a single loan origination fee, as long as the aggregate fees charged and collected do not exceed the statutory maximum. We conclude further that Appellees were not required by the SMLL to provide borrowers—who admit that they did not intend, at the time of closing on their loans, to use the proceeds of their secondary mortgage loans for commercial purposes—a disclosure form designed expressly to advise commercial borrowers only under the SMLL. Concluding finally that certain Appellants (the Dinnises, Schultz, and the Moores) failed to support sufficiently their allegations of breach of contract, CPA violations, and claims in accounting with specific facts, we affirm the dismissal of these claims for failure to state a claim upon which relief may be granted. As we do not find violations of the SMLL, CPA, or breach of contract, we do not reach Appellants' assignee derivative liability and statute of limitations questions. Accordingly, we affirm the dismissals of each of the cases by the Circuit Courts for Baltimore City and Anne Arundel County, respectively.

## I. Factual and Procedural Background

*Polek v. J.P. Morgan Chase Bank, N.A.*

On 24 May 2009, Michael T. Polek Jr. and his wife, Linda L. Polek ("the Poleks"), obtained a secondary mortgage loan, secured by their primary residence, from Baltimore American Mortgage Corporation ("BAMC"). The principal amount of the loan was $40,000.00, with an interest rate of 12.125 percent. The scheduled last payment on the loan would have been due on 28 May 2014. On the day the loan closed, BAMC assigned the indebtedness and deed of trust to Banc One Financial Services, Inc. ("Banc One"), which later assigned the loan to Household Finance Corporation, III ("Household Finance"). J.P. Morgan Chase Bank, N.A. ("J.P. Morgan

---

5. *See Master Fin. Inc. v. Crowder,* 409 Md. 51, 972 A.2d 864 (2009) (concluding that claims under the SMLL are a statutory specialty and, therefore, entitled to a 12–year statute of limitations).

Chase") is the successor to Banc One. The mandatory settlement sheet, HUD–1 form, provided to the Poleks at their closing reflected no charge for the line item "origination fee," but rather itemized a number of other fees.[6]

On 24 March 2010, the Poleks filed, in the Circuit Court for Baltimore City, a complaint against BAMC, J.P. Morgan Chase, and Banc One for violations of the SMLL in connection with the 2009 loan. The amended complaint (which added Household Finance as a defendant as the purported current holder of the Poleks' note) alleged that, at closing, the Poleks were charged fees in excess of the statutory maximum in § 12–405 and they were not provided a mandatory disclosure form required in § 12–407.1. The Poleks alleged that Banc One and Household Finance were not holders-in-due-course and, therefore, were subject to the claims asserted against BAMC. The amended complaint stated further that Banc One and Household Finance violated knowingly the SMLL, thereby entitling the Poleks to treble damages. The Poleks alleged that the HUD–1 form, received presumedly by the assignees in the course of the assignment, provided sufficient information to put on notice Banc One and Household Finance that the secondary mortgage loan was made in violation of the SMLL.

J.P. Morgan Chase, Banc One, and Household Finance filed a motion to dismiss the amended complaint. Judge Evelyn Omega Cannon presided over a hearing on the motion to dismiss and, agreeing with the reasoning in a then recently decided United States District Court case, *Hafford v. Equity One, Inc.*, 2008 WL 906015, 2008 U.S. Dist. LEXIS 31964 (D.Md.2008), concluded that the lenders had not violated the

---

**6.** The Poleks were charged an appraisal fee of $175.00, a credit report fee of $15.50, a document preparation fee of $350.00, an underwriting fee of $150.00, a settlement or closing fee of $300.00, an abstract or title search fee of $68.00, a title examination fee of $100.00, a notary fee of $14.00, a title insurance fee of $100.00, a fee of $35.00 for walking-through recordation, a judgment search fee of $40.00, a processing fee of $30.00, and an overnight document delivery fee of $25.00. The total amount of the fees charged was $1,402.50, or 3.5% of the principal amount of the loan.

SMLL in any respect. The Circuit Court refused to "construe Section 12–405 in a manner that would unreasonably and illogically require defendants to lump together all of those fees, denote those fees as a single loan origination fee, and to rob borrowers of the protection of being [informed] of the exact costs involved." Judge Cannon concluded also that the "missing" disclosure form, on its face, was required for commercial loans only; therefore, defendants had not violated § 12–407.1. The court granted the motion to dismiss, concluding that defendants were not subject to assignee liability under the SMLL, Md.Code (1957, 2002 Repl.Vol.) Com. Law Art., § 3–306,[7] or Maryland common law. The Poleks filed timely an appeal to the Court of Special Appeals. We issued a writ of certiorari, *Polek v. J.P. Morgan Chase Bank, N.A.*, 420 Md. 81, 21 A.3d 1063 (2011), before the intermediate appellate court decided the appeal.

*Dinnis v. J.P. Morgan Chase, N.A.*

On 22 September 1997, Richard S. and Concetta Dinnis ("the Dinnises") received a secondary mortgage loan, secured by their residence, from BAMC. The principal of the loan was $43,000.00. The last scheduled payment would have been due on 26 September 2012. At closing, BAMC assigned the note and deed of trust to Banc One. J.P. Morgan Chase succeeded Banc One. The Dinnises paid off the loan early and, on 21 May 2008, Banc One recorded properly a certificate of satisfaction.

On 9 August 2010, the Dinnises filed in the Circuit Court for Baltimore City a complaint against J.P. Morgan Chase and BAMC. The Dinnises did not have a copy of the note or any other documents relating to the closing on their secondary mortgage loan. Thus, before the complaint was filed, they requested a copy of the mortgage loan documents from J.P.

---

7. § 3–306. Claims to an instrument.

A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds. A person having rights of a holder in due course takes free of the claim to the instrument.

Morgan Chase, which refused the request. The Dinnises asserted in their complaint nonetheless that J.P. Morgan Chase was liable as an assignee of BAMC, under Com. Law Art., § 3–306, for breach of contract, and violations of the SMLL and the CPA, similar to the Poleks' suit. The complaint based the breach of contract claim on an alleged breach of the implied covenant of good faith and fair dealing when J.P. Morgan Chase refused to provide copies of the requested documents from the Dinnises' closing with BAMC. The CPA claim arising from the refusal to supply copies of the 1997 closing documentation was based on an alleged "pattern of deceptive conduct and concealment aimed at preventing the [Dinnises] from discovering whether possible causes of action exist that relate" to their secondary mortgage loan. The SMLL action was based "upon information and belief" that the Dinnises had been charged excessive fees at the loan closing [8] and were not given the § 12–407.1 mandatory disclosure form. The Dinnises charged that J.P. Morgan Chase was not a holder-in-due-course on the note and therefore was liable directly and derivatively for the claims asserted against BAMC. The complaint requested treble damages for J.P. Morgan Chase's knowing violation of the SMLL based on the information contained in the HUD–1 form assumedly passed on to J.P. Morgan Chase and/or Banc One.

On 10 November 2010, defendants filed a motion to dismiss. A hearing was set for 31 January 2011. For the purposes of the hearing, the Dinnises' case was consolidated with the Kinseys' case, discussed *infra*. Judge Cannon presided over the hearing and dismissed the cases on the same grounds as in *Polek*, discussed *supra*. At the conclusion of the hearing, the judge noted also that she was "not convinced" that a cause of action existed for J.P. Morgan Chase's assignee liability and failure to produce loan document claims. The Dinnises filed timely an appeal to the Court of Special Appeals, but we

---

8. Because the Dinnises did not have a HUD–1 form that showed what, if anything, they were charged for a "loan origination fee" or other fees, their allegation was based the fact that the lender "routinely collected closing costs and fees in excess of the maximum allowed...."

issued a writ of certiorari, *Dinnis v. J.P. Morgan Chase Bank, N.A.*, 420 Md. 81, 21 A.3d 1063 (2011), before the intermediate appellate court decided the appeal.

*Kinsey v. J.P. Morgan Chase, N.A.*

On 16 May 2000, John W. and Denise Kinsey ("the Kinseys") closed on a secondary mortgage loan, secured by their residence, from BAMC. The principal of the loan was $30,000.00. At closing, the note and deed of trust were assigned to Banc One. J.P. Morgan Chase is the successor to Banc One. The last scheduled payment under the loan would have been due 22 May 2020. The Kinseys repaid the loan early and, on 1 April 2004, Banc One recorded a certificate of satisfaction. The HUD–1 form provided to the Kinseys at their closing did not have any charge for the line item "origination fee," but rather a number of individual, itemized fees were charged and collected.[9]

On 9 August 2010, the Kinseys filed, in the Circuit Court for Baltimore City, a complaint against BAMC and J.P. Morgan Chase alleging violations of the SMLL. The Kinseys alleged that, at the loan closing, they were charged excessive fees (because no single origination fee was charged, but instead multiple other fees were charged) and were not provided the § 12–407.1 mandatory disclosure. An amended complaint asserted that J.P. Morgan Chase was not a holder-in-due-course and, therefore, was liable directly and derivatively for all the claims against BAMC. The Kinseys requested treble damages for knowing violations of the SMLL based on information contained in the HUD–1 form, allegedly received by J.P. Morgan Chase through assignment of the loan.

Defendants filed a motion to dismiss on 19 November 2010. A hearing, combined with the *Dinnis* case as noted, occurred

---

9. The Kinseys were charged a discount fee of $600.00, a credit report fee of $15.50, a document preparation fee of $550.00, a flood certification fee of $16.50, a warehouse fee of $165.00, a second credit report fee of $21.00, a settlement fee of $450.00, a title search fee of $100.00, and a recording and disbursement fee of $100.00. They were also charged an appraisal fee prior to closing of $175.00. The total charges were $2,542.00, or 8.47% of the principal amount of the loan.

before Judge Cannon on 31 January 2011. As discussed *supra*, the motion to dismiss was granted for the same reasons explicated by Judge Cannon in the *Polek* case. The Kinseys filed timely an appeal to the Court of Special Appeals, but we issued a writ of certiorari, *Kinsey v. J.P. Morgan Chase Bank, N.A.*, 420 Md. 81, 21 A.3d 1063 (2011), before the intermediate appellate court decided the appeal.

*Schultz v. Citimortgage, Inc.*

On 11 June 1999, Frank J. Schultz, Jr. and his wife (since deceased and no longer a party to this action) closed on a secondary mortgage loan, secured by their residence, with California Lending Group. The principal amount of the loan was $21,775.00 and the last scheduled payment on the loan would have been due on 1 July 2014. At or around the time of closing, the note and deed of trust were assigned to Home Equity Services, Inc. Through mergers and name changes, Home Equity Services, Inc. became the defendant Citimortgage, Inc. ("Citimortgage"). Schultz paid-off the loan early and a certificate of satisfaction of the indebtedness was recorded on 10 January 2001.

On 4 November 2010, Schultz filed, in the Circuit Court for Anne Arundel County, a complaint against Citimortgage for alleged violations of the SMLL. At the time the complaint was filed, Schultz did not possess copies of the note or other documents relating to the secondary mortgage loan or the closing from 1999. Prior to filing the suit, Schultz requested copies of the documents from Citimortage, which denied the request. The complaint alleged Citimortgage was subject to all claims against the original lender, California Lending Group, through assignee liability under Com. Law Art., § 3–306. Schultz alleged further that Citimortgage was not a holder-in-due-course because it had notice of the alleged SMLL violations based on information in the HUD–1 form from the 1999 closing, received ostensibly through the assignment of the loan. Schultz complained of the same violations of breach of contract, the CPA, and the SMLL as described in *Dinnis*, discussed *supra*.[10]

---

**10.** Because he did not have a HUD–1 form from his closing, his foundational allegations were based on the fact that the lender "rou-

Citimortgage filed a motion to dismiss the complaint, which was granted by Judge Philip Caroom in a 20 January 2011 order. Judge Caroom concluded that the complaint was comprised of "general, conclusory allegations as to violations of statute 'on information and belief,'" and that the allegations failed to state a claim upon which relief may be granted, according to the Maryland pleading requirements explicated in Md. Rule 2–322(b), and explained in *A.J. Decoster Co. v. Westinghouse Electric Corp.,* 333 Md. 245, 634 A.2d 1330 (1994). The Circuit Court concluded further that there is "no statutory or common law right to disclosure of records on a closed account when a) it is not alleged that such information was not provided initially to the Plaintiff and b) there could be no retroactive 'reliance' for deceit or consumer protection purposes for failure to disclose." Schultz filed timely an appeal to the Court of Special Appeals, but we issued a writ of certiorari, *Schultz v. Citimortgage, Inc.,* 424 Md. 54, 33 A.3d 981 (2011), before the intermediate appellate court decided the appeal.

*Moore v. Residential Funding Co.*

On 8 November 1996, Elizabeth and Alric Moore ("the Moores") closed on a secondary mortgage loan, secured by their primary residence, with BAMC. The principal amount of the loan was $54,500.00. The last scheduled payment under the loan would have been due on 14 December 2021. At the closing, the note and deed of trust were assigned to Master Financial. Master Financial filed later for bankruptcy protection and the loan was assigned to The Chase Manhattan Bank as Indenture Trustee, Residential Funding Corporation ("Residential"), Attorney in Fact. J.P. Morgan Chase is the successor to The Chase Manhattan Bank. On 1 December 2004, a certificate of satisfaction as to the indebtedness was recorded because the Moores paid-off the loan early.

tinely collected closing costs and fees in excess of the maximum allowed...."

On 11 May 2010, the Moores filed, in the Circuit Court for Baltimore City, a complaint against BAMC, Residential, and J.P. Morgan Chase for breach of contract and violations of the CPA and SMLL. Like the Dinnises and Mr. Schultz, the Moores did not retain copies of the documents from their closing, so they requested copies from Residential and J.P. Morgan Chase, which denied the request; therefore, when the complaint was filed, the Moores were unable to allege relevant facts from personal knowledge about the closing. The complaint alleged, nonetheless, that Residential and J.P. Mortgage Chase were subject to all claims against the original lender, BAMC, through assignee liability under Com. Law Art., § 3–306. The Moores alleged further that Residential and J.P. Morgan Chase were not holders-in-due-course because they had notice of the alleged SMLL violations based on information in the HUD–1 form allegedly received by Residential and J.P. Morgan Chase through the assignments. The Moores asserted similar violations of breach of contract, the CPA, and the SMLL as described in *Dinnis*, discussed *supra*.[11]

On 12 November 2010, defendants filed a motion to dismiss for failure to state a claim upon which relief may be granted, which motion was granted by Judge Cannon. The Moores filed timely an appeal to the Court of Special Appeals, but we issued a writ of certiorari *Moore v. Residential Funding Co.*, 422 Md. 353, 30 A.3d 193 (2011), before the intermediate appellate court decided the appeal.

We granted certiorari in these cases to consider the following collective questions,[12] which we reword slightly:

---

11. The Moores did not have a HUD–1 form showing that they were not charged a "loan origination fee," but were charged itemized other fees. Thus, their allegation was based on the fact that the lender "routinely collected closing costs and fees in excess of the maximum allowed...."

12. The plaintiffs in each of the cases consolidated here were represented by the same counsel in the trial courts and before us. We note in parentheticals after each question in which of the consolidated cases the question was raised.

1) Does § 12–405 of the SMLL limit lender compensation to only a single origination fee, or may a lender collect any number of separately labeled closing fees, costs and charges as long as the total amount of such fees, costs and charges, loan origination and finder's fees, if any, are less than ten percent of the net proceeds of the loan? (all of the cases)

2) Is the SMLL violated when a lender fails to provide a borrower the disclosure required § 12–407.1? (all of the cases)

3) Does an assignee's refusal to provide a borrower with a copy of the secondary mortgage loan file give rise to a cause of action under Maryland law? (*Dinnis*, *Schultz*, and *Moore*)

4) Is an assignee of a secondary mortgage subject to the SMLL claims that could be raised by the borrower against the originating lender by operation of Com. Law Art., § 3–306, which provides that a person taking an instrument, other than a person having the rights of a holder-in-due-course, is subject to a claim of a possessory or property right in the instrument or its proceeds? (all of the cases)

5) Is an assignee of a secondary mortgage subject to the SMLL claims that could be raised by the borrower against the originating lender by operation of Maryland common law? (all of the cases)

6) Does the 12–year statute of limitations apply to SMLL claims brought against assignees of secondary mortgages? (all of the cases)

We hold that: 1) a mortgage lender may itemize the fees it charges that relate to loan origination, so long as the aggregate total of the fees related to loan origination does not exceed the 10% statutory cap in § 12–405; 2) § 12–407.1 requires a disclosure only for borrowers disclosing that they will use the proceeds from the secondary mortgage loan for commercial purposes; and 3) assignees of secondary mortgage loans owe no implied duty to the borrowers to retain any loan closing documentation received, after the debt has been satisfied and the contractual requirements of the contract are

discharged.[13] Finding no violations of the SMLL, the CPA, or the common law, we affirm the judgments of the Circuit Courts for Baltimore City and Anne Arundel County.

## II. Standards of Review

■ These cases present solely questions of statutory interpretation. We review a trial court's interpretation of a statute through a non-deferential prism. *Breslin v. Powell,* 421 Md. 266, 286, 26 A.3d 878, 891 (2011) (citing *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2002) ("[W]here the order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a [non-deferential] standard of review.")).

■ Each case was disposed of through the grant of a motion to dismiss. When considering such dispositions accomplished through this procedural vehicle, we assume the truth of all well-pled facts and allegations in the complaint, as well as reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party. *RRC Northeast, LLC v. BAA Md., Inc.,* 413 Md. 638, 643, 994 A.2d 430, 434 (2010) (citing *Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 121–22, 916 A.2d 257, 264–65 (2007); *Sprenger v. Pub. Serv. Comm'n of Md.,* 400 Md. 1, 21, 926 A.2d 238, 249–50 (2007); *Pendleton v. State,* 398 Md. 447, 458–60, 921 A.2d 196, 203–04 (2007).) Upon appellate review, the grant of a motion to dismiss for failure to state a claim upon which relief may be granted is affirmed only if the allegations and inferences would not provide relief to the plaintiff. *RRC Northeast,* 413 Md. at 643, 994 A.2d at 434. A reviewing court may look only to the facts and allegations contained in the original complaint. *Id.* (citing *Converge Servs. Grp., LLC v. Curran,* 383 Md. 462, 474, 860 A.2d 871, 879 (2004)). The facts in the complaint

---

13. In view of our holdings disposing of Questions 1, 2 and 3 above, there is no need to address Questions 4, 5, and 6 because there is no remaining basis for direct or derivative liability on the part of the original lenders or for their assignees.

must be pled with specificity; bald allegations and conclusory statements are not sufficient to support a complaint. *RRC Northeast,* 413 Md. at 644, 994 A.2d at 434 (citing *Adamson v. Corr. Med. Servs. Inc.,* 359 Md. 238, 246, 753 A.2d 501, 505 (2000)).

### III. Discussion

### A. Alleged Violations of § 12–405

We begin the statutory interpretation process by looking to the plain language of a statute, giving the words their natural and ordinary meaning. *Breslin,* 421 Md. at 286, 26 A.3d at 891 (citing *State Dep't of Assessments and Tax'n v. Md.-Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 13, 702 A.2d 690, 696 (1997)). To determine the plain meaning of language, we consider the statutory scheme in which the particular provision or provisions appear. *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339, 1341 (1996) (citing *Kaczorowksi v. Mayor of Balt.,* 309 Md. 505, 514, 525 A.2d 628, 632 (1987)) ("[The meaning of the plain language] is controlled by the context in which it appears."). If the language is clear and unambiguous on its face, our inquiry ends. *Id.* (citing *Marriot Emps. Fed. Credit Union v. MVA,* 346 Md. 437, 445, 697 A.2d 455, 458 (1997)). If the language is ambiguous, we turn to indirect approaches in aid of ascertaining the intent of the Legislature. *Breslin,* 421 Md. at 287, 26 A.3d at 891 (citing *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998)) ("[C]ourts will look for other clues—e.g., the construction of the statute, the relation of the statute to other laws in a legislative scheme, the legislative history, and the general purpose and intent of the statute."). When interpreting an ambiguous statute, we must construe the law in such a way as to avoid illogical or nonsensical conclusions. *Whiting–Turner Contracting Co. v. Fitzpatrick,* 366 Md. 295, 302, 783 A.2d 667, 671 (2001) (citing *State v. Brantner,* 360 Md. 314, 322, 758 A.2d 84, 88–89 (2000)).

Section 12–405 of the SMLL, at issue here, governs origination fees and states, in relevant part:

(a) *Origination fee.*—(1) A lender may collect a loan origination fee for making a loan under this subtitle only as provided in this section.

(2) The aggregate amount of the loan origination fee imposed by a lender under this section when combined with any finder's fee imposed by a mortgage broker under § 12–804 of this title may not exceed the greater of:

(i) $500 or 10 percent of the net proceeds of a commercial loan of $75,000 or less made under this subtitle; or

(ii) $250 or 10 percent of the net proceeds of any other loan made under this subtitle.

(3) A lender may not collect from the borrower any other commission, finder's fee, or point for obtaining, procuring, or placing a loan under this subtitle....

Appellants contend that § 12–405 limits lenders to collecting a single loan origination fee; however, they concede that this single fee may be comprised theoretically of distinct costs and charges, so long as there is but one labeled "loan origination fee." Appellees retort that this reading of § 12–405 is too narrow and that the General Assembly only intended to limit the amount of the aggregate origination fee in relation to the overall amount of the secondary loan, rather than the number of itemized expenses and charges that constitute loan origination fees.[14]

Interpretation of this provision of the SMLL is an issue of first impression for this Court; however, similar issues were addressed by the United States District Court for the District of Maryland in two cases. In *Miller v. Pac. Shore Funding*, 224 F.Supp.2d 977 (D.Md.2002), two plaintiffs alleged violations of the SMLL and the CPA.[15] The first plaintiff alleged

---

14. All parties agree that the sum of the fees charged by the lenders in connection with originating each loan were below 10% of the net proceeds of the secondary mortgage loan amount, as required in § 12–405(a)(2).

15. The plaintiffs in *Miller* asserted also a claim of illegal contract, a claim not at issue in these appeals.

that, at the closing of his secondary mortgage loan, he was charged excessive or unauthorized fees, rather than a single loan origination fee, in violation of § 12–405 of the SMLL, and he was not provided with the mandatory § 14–701.1 form. *Miller*, 224 F.Supp.2d at 989. Despite his attempted reliance on the discovery rule and alleged acts of fraud that led to a failure to discover his injuries, the first plaintiff's statutory SMLL claims in *Miller* were dismissed because the complaint was filed after the three-year statute of limitations applied by the court.[16] The first plaintiff alleged also that Pacific Shore Funding violated the CPA by "failing to state the material fact that [his] loan was governed by the SMLL." *Miller*, 224 F.Supp.2d at 989.

The court concluded that the lender did not violate the CPA because disclosure that the SMLL governed the loan was not a material fact, but rather a law, and "failure to state a material law is a failure to state a material *fact* only if the law requires that the law be stated." *Id.* Looking to § 12–407.1, the federal court concluded that the SMLL only requires the disclosure if the loan proceeds were to be used for commercial purposes. *Id.* The plaintiff did not allege the loan proceeds would be used for a commercial purpose, therefore, "the lender has no obligation to disclose the rights that the borrower is not forfeiting." *Id.*

The second plaintiffs in *Miller* (a married couple) alleged that the lender charged them loan origination fees in excess of the 10% cap allowed by the SMLL. 224 F.Supp.2d at 992. The "loan origination fee" on their HUD–1 form did not exceed, on its own, the cap, instead, this fee, plus various other fees (including a funding fee, a processing fee, an express mail fee, a signing fee, a sub-escrow fee, a title exam fee, and a flood certification fee), when aggregated, exceeded the cap.[17] *Id.*

---

**16.** The plaintiff argued also that because the origination fees were not pre-paid at closing, but rather were wrapped into the installment payments on the loan, that each payment on the loan constituted a new violation of the SMLL. The court, however, was not persuaded by this argument in avoidance of the limitations defense.

**17.** The permitted origination fee under the SMLL, based on the loan principal, was $3,154.26. The loan origination fee was $2,450. The

The court identified two possible interpretations and applications of the term "loan origination fee." *Miller*, 224 F.Supp.2d at 992–93. The first interpretation was that the lender's labeling of fees was important and, therefore, the seven additional fees not labeled "loan origination fees," and not subsumed there, were unauthorized. *Id.* Alternatively, the court considered that, if the labels were irrelevant largely, the aggregated fees were in excess of the 10% cap. *Miller*, 224 F.Supp.2d at 993. As the dispute was before the court on a motion to dismiss, the court declined to decide between the two interpretations and applications, concluding that, under either, the plaintiffs stated a claim. *Id.*

Most recently, the federal court decided *Hafford v. Equity One, Inc.*, 2008 WL 906015, at *3–4, 2008 U.S. Dist. LEXIS 31964, at *13 (D.Md.2008), where several borrower-plaintiffs filed complaints against lender-defendants for violations of § 12–405. A subset of the plaintiffs each were charged a labeled "loan origination fee," but all plaintiffs were charged a variety of other itemized fees, such as "tax service fees," "flood service fees," and "document preparation." *Hafford*, 2008 WL 906015, at *2, 2008 U.S. Dist. LEXIS, at *7. The "loan origination fee" and other named fees charged in each of the secondary mortgages, when aggregated, did not exceed the statutory 10% cap. *Hafford*, 2008 WL 906015, at *5, 2008 U.S. Dist. LEXIS, at *17.

The court reviewed the legislative history of the relevant amendments to § 12–405 and concluded that "the legislature's main objective was to establish a statutory cap." *Hafford*, 2008 WL 906015, at *7, 2008 U.S. Dist. LEXIS, at *24. The court looked to online glossaries maintained by the United States Department of Housing and Urban Development ("HUD") and mortgage lender Fannie Mae and concluded that the term "loan origination fee does not necessarily denote a

---

various other fees totaled an additional $1,173. *Miller v. Pacific Shore Funding*, 224 F.Supp.2d 977, 992 (D.Md.2002).

single fee and instead means fees associated with the cost of originating the loan." *Hafford,* 2008 WL 906015, at *7, 2008 U.S. Dist. LEXIS, at *24–25. The court upheld the multiple fees charged by the borrowers, noting also that Maryland lenders are subject also to the Real Estate Settlement Procedure Act ("RESPA"), which requires lenders to "conspicuously and clearly itemize all charges imposed on the borrower." *Hafford,* 2008 WL 906015, at *9, 2008 U.S. Dist. LEXIS, at *28–30 (citing 12 U.S.C. § 2603 (2006)).

In the present cases, Appellants argue that § 12–405(a) limits the lender to charging a single "loan origination fee" because the plain language of the statute does not employ the plural "fees." Appellants refer also to the legislative history of the most recent amendments to the SMLL in 1998 in an effort to persuade us that the General Assembly intended purportedly to allow only a single "loan origination fee" and "points," charged as a finder's or broker's fee. They maintain that the statutory 10% cap aggregates only the "points" and the "loan origination fee" and, therefore, the additional fees that are not "interest" were not "points" and not authorized under the SMLL. Appellees counter that Appellants' reading of the SMLL is too narrow and that "aggregate" refers implicitly to multiple fees associated with loan origination fee. Appellees contend further that the General Assembly did not intend for lenders to obfuscate numerous otherwise itemized fees into one "loan origination fee" in a black box on the HUD–1.

We conclude that the language of § 12–405 is patently ambiguous and subject to more than one reasonable interpretation; therefore, we shall turn to the legislative history of the statute and other accepted extrinsic aids to guide us in ascertaining the proper construction of the law. In 1997, the General Assembly convened a task force to examine the mortgage lending business in Maryland, including specifically a "cap" on secondary mortgage fees. Task Force to Examine the Mortgage Lending Business, *Final Report* 1 (1997) [hereinafter *Final Report* ]. Based upon the recommendations of the task force, the General Assembly adopted a bill that

"alters the regulation of the mortgage lending business by restricting to 10, the total points mortgage brokers and mortgage lenders may charge on secondary mortgages." *See* Md. Fisc. Note, 1998 Sess., H.B. 202. The 1997 statute allocated two points for lenders and eight points for brokers. *Id.* The consumer members of the task force commented that a combined "cap" would make it easier for consumers to understand what was being charged. *Final Report, supra,* at 2. The purpose of the bill was to alter the "manner in which certain points, loan origination fees, commissions, finder's fees, or similar charges" may be allocated and to establish "an aggregate percentage cap on the amount of such charges." Act of 21 May 1998, ch. 760, 1998 Md. Laws. The bill allowed "mortgage lenders and brokers ... to allocate the points among themselves." *Id.* This suggests that the purpose of the revisions to § 12–405 was to place a cap on the amount of fees charged for making the loan.

The term "loan origination fee" is not defined in the SMLL, or elsewhere in the Commercial Law Article. Appellate judicial opinions addressing mortgage and deed of trust lending issues have employed the term "loan origination fee," but not defined the term. *See, e.g., Byars v. SCME Mortg. Bankers, Inc.* 109 Cal.App.4th 1134, 135 Cal.Rptr.2d 796 (2003). The federal HUD defines origination fee as "the charge for originating a loan; is usually calculated in the form of points and paid at closing." HUD.GOV Glossary, http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/buying/glossary (last visited 16 December 2011). "Origination" is defined as "the process of preparing, submitting, and evaluating a loan application; generally includes a credit check, verification of employment, and a property appraisal." *Id.*

While not directly applicable to the present case, the federal government guidance for charges, fees, and discounts for loans originating under the National Housing Act is informative here. 24 C.F.R. § 203.27 (2009). This federal regulation allows "reasonable and customary amounts" of charges and fees "for expenses incurred in originating and closing the loan," including recordation fees and taxes; credit reports;

surveys; title fees; inspection and appraisal fees; and "such other reasonable and customary charges as may be authorized." *Id.* This regulation appears to acknowledge that loan origination fees are based on the individual mortgage at hand and a range of named fees are customary in the industry. Based on the industry usage of the term "origination fee," it appears that the various fees charged (or assumedly charged) Appellants would be considered fees relating to the origination of the loans.

While the term "aggregate" introduces ambiguity in the statute, it also provides some guidance as to the intent of the Legislature. "Aggregate" implies that there are multiple components within an overall "loan origination fee." Further, § 12-405(a)(2) states that it is the aggregate amount of the loan origination fee, *"when combined* with any finder's fee imposed," that may not exceed the statutory cap. (Emphasis added.) "When combined" means that the "loan origination fee" (which may be made up of components) is added to the authorized finder's fee and then compared against the 10% cap of the net proceeds of the loan to determine statutory compliance.

Section 12–405(a)(3), prohibiting "any other commission, finder's fee, or point for obtaining, procuring, or placing a loan" does not prohibit the itemized fees charged to Appellants, as they argue, because those fees are components of the "loan origination fee" referenced in § 12–405(a)(2). In light of the legislative purpose of § 12–405 of the SMLL, to cap the amount of the fees, the industry understanding of the term "loan origination fee" (which presumably, was known by the Legislature in 1997–98), and the reference to "aggregate amount of the loan origination fee," we conclude that the various itemized fees charged on the settlement sheets at Appellants' closing (but where no amount was charged on the line item "loan origination fee," or assumedly so) are not prohibited, so long as they do not exceed the 10% cap when aggregated.

We agree with the federal district court's reasoning in *Hafford*, that § 12–405 and RESPA purport to regulate the same subject matter (mortgage loan fees) and should be construed together and harmonized to the extent possible. 2008 WL 906015, at *9–10, 2008 U.S. Dist. LEXIS, at *32 (citing *Md.-Nat'l Cap. Park & Planning Comm'n v. Anderson*, 395 Md. 172, 183, 909 A.2d 694, 700 (Md.2006)). RESPA encourages fuller disclosure and was designed to "insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process." 12 U.S.C. § 2601 (2006). The HUD–1 form referred to by Appellants is required by RESPA. RESPA does not limit fees or determine how fees are charged.

Appellants' argument would require that each lender charge only one "loan origination fee," comprised actually of various otherwise named fees and charges related to the origination of each loan, rather than itemizing and identifying for the consumer the fees to be paid in connection with originating the loan. This would not provide consumers greater "information on the nature and costs of the settlement process." In fact, quite the opposite would occur. Consumers would not be given the information to determine, for example, whether the appraisal fee or the title search fee they were to be charged, for example, was reasonable. The 1997 Task Force noted that the combined cap on secondary mortgage fees would help the consumer understand what they were being charged. Forcing multiple charges to be combined into one line item on a settlement document would not further the needs of Maryland consumers recognized by the General Assembly; therefore, we conclude that what transpired (or assumedly transpired) at the settlements on the secondary mortgage loans of these Appellants was consistent with proper implementation of the goals of the SMLL and RESPA.

### B. Alleged Violations of § 12–407.1

Appellants allege violations of § 12–407.1 of the SMLL because the lenders failed to provide them a disclosure form prescribed in that section. Section 12–407.1 requires the

Commissioner of Financial Regulation ("Commissioner") to develop a form applicable to secondary mortgage loans. The relevant portion of this statute states:

(a) *Commissioner to develop form.*—The Commissioner shall develop and prepare a form that each lender shall furnish to an applicant for a secondary mortgage loan. The form shall state the following:

(1) The purpose for which the loan is to be used;

(2) A disclosure that, if the loan is for a commercial purpose, the borrower shall forfeit certain rights.

(b) *Required explanation of forfeiture of rights.*—The form shall state that the forfeiture of rights includes:

(1) The borrower's right to pay a loan origination fee that, when combined with any finder's fee imposed by a mortgage broker under § 12–804 of this title, does not exceed the greater of:

(i) $500 or 10 percent of the net proceeds of a commercial loan of $75,000 or less made under this subtitle; or

(ii) $250 or 10 percent of the net proceeds of any other loan made under this subtitle;

(2) The borrower's right not to pay any other commission, finder's fees, or point for obtaining, procuring, or placing a loan; and

(3) The borrower's right not to pay an interest rate greater than 24 percent. . . .

Appellants maintain that the statutory phrase "each lender shall furnish to an applicant for a secondary mortgage loan," means that the original lenders violated this provision of the SMLL when they failed to provide them such a disclosure form. Appellees counter that this section of the SMLL requires the form be given only to borrowers who indicate an intention to use the proceeds of the loan for commercial purposes, which no Appellant proposed.

Appellants' argument leads to an illogical conclusion and pulls out of context one phrase from § 12–407.1. The entirety of § 12–407.1 is focused on providing borrowers who indicate

an intention to use the proceeds of a loan for commercial purposes explicit disclosure of the rights they are waiving by using the proceeds of a secondary mortgage loan for commercial purposes, instead of borrowing the money through another type of loan. Borrowers who do not use the loan proceeds for commercial purposes, like Appellants, do not forfeit anything and, therefore, lenders have nothing to disclose to them. Nothing in § 12–407.1 applies to Appellants who, admittedly, did not indicate they intended to use their loan proceeds for commercial purposes.

The form created by the Commissioner under § 12–407.1 reads plainly at the top "SECONDARY MORTGAGE COMMERCIAL LOAN DISCLOSURE" and states that the borrower has "indicated that the Secondary Mortgage Loan . . . is to be used solely to acquire or carry on a business or commercial enterprise." The form then recites the relevant portions of § 12–407.1(b) explaining the borrower's forfeiture of rights under those circumstances. Appellants do not argue that the form was prepared incorrectly or that they should have been given a form that only a commercial borrower would sign; rather, they protest that a form that does not apply to them was not given to them at closing. This argument has no traction with us. Accordingly, we conclude that Appellees were not required to provide the commercial loan disclosure form to Appellants and, therefore, there was no violation (actual or assumed) of § 12–407.1 of the SMLL.

### C. Alleged Requirement for Assignees to Retain Assignors' Secondary Mortgage Loan Closing Documents

 Appellants (the Dinnises, Schultz, and the Moores) maintain that Appellees' refusal to provide them with copies of "all documents relating to the secondary mortgage loan transaction" in each of their cases gives rise to a cause of action under contract law, the CPA, and for common law accounting. Appellants allege a breach of contract because Appellees' refusal frustrated Appellants' ability to determine properly whether any potential SMLL loan origination fee violations occurred, thereby violating an implied covenant of good faith

and fair dealing. Appellees counter that the contractual relationship between the parties ended when the certificates of satisfaction were recorded and that there exists no continuing implied covenant of good faith and fair dealing (if one arose at all) after the contractual relationship ended, i.e., the loans were paid-off and the security interests released.

In *Gephardt v. Mortgage Consultants, Inc.*, 2011 WL 531976, 2011 U.S. Dist. LEXIS 11922 (D.Md.2011), the federal district court concluded that similar claims of breach of contract, violation of the CPA, and for an accounting were without merit. The plaintiffs in *Gephardt* requested from defendant-assignee, six years after the certificate of satisfaction was recorded, copies of all documents relating to their secondary mortgage loan. *Gephardt*, 2011 WL 531976, at *1, 2011 U.S. Dist. LEXIS 11922, at *2–3. Defendant refused and plaintiffs filed a complaint based on the failure to produce the loan documents. *Gephardt*, 2011 WL 531976, at *1, 2011 U.S. Dist. LEXIS 11922, at *3.

The court concluded that plaintiffs sought to create a new obligation, not required under the terms of the loan, and failed to show how the assignee bank did not act in good faith in performing its duties under the contract. *Gephardt*, 2011 WL 531976, at *2, 2011 U.S. Dist. LEXIS 11922, at *6. The breach of contract count was dismissed for failure to state a plausible claim. *Id.* The court also concluded that plaintiffs' CPA claim lacked merit because the complaint failed to plead material facts showing the bank "deceive[d] or tend[ed] to deceive." *Gephardt*, 2011 WL 531976, at *3, 2011 U.S. Dist. LEXIS 11922, at *8 (quoting § 13–301(3)). The court concluded that "[i]t is not deceptive to require consumers to depend upon the timely disclosed, truthful information, rather than allow them to demand duplicate copies of this information at any [time] they come to believe they may have a valid cause of action." *Gephardt*, 2011 WL 531976, at *3, 2011 U.S. Dist. LEXIS 11922, at *9. Finding no knowing "concealment, suppression, or omission" of a material fact by the defendant "with the intent that a consumer rely on the same," the court inferred that defendant believed reasonably there was no requirement

for them to provide copies of loan documents six years after satisfaction of the debt. *Id.* The plaintiffs failed further to state a claim under the CPA by alleging insufficiently "actual injury or loss sustained." *Gephardt,* 2011 WL 531976, at *4, 2011 U.S. Dist. LEXIS 11922, at *10–11. Finding no sufficient allegations of a confidential or fiduciary relationship, the court dismissed also the plaintiffs' claim for an accounting. *Gephardt,* 2011 WL 531976, at *5, 2011 U.S. Dist. LEXIS 11922, at *14–15.

Maryland law requires that a plaintiff alleging a breach of contract "must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant." *Cont'l Masonry Co. v. Verdel Constr. Co.,* 279 Md. 476, 480, 369 A.2d 566, 569 (1977). When we consider the sufficiency of the plaintiff's allegations, we construe any ambiguity in the complaint against the pleader. *Id; Carder v. Steiner,* 225 Md. 271, 276, 170 A.2d 220, 222 (1961). Appellants do not argue that there are any provisions in the secondary mortgage loan documents that require expressly Appellees (whether the original lender/assignor or the assignees) to retain records or provide them to borrowers after a certificate of satisfaction is filed; rather, Appellants rely on an implied covenant of good faith and fair dealing between the parties.

Maryland law recognizes an implied duty of good faith and fair dealing as applied to the "performance and enforcement" of the contract itself. *Blondell v. Littlepage,* 413 Md. 96, 113, 991 A.2d 80, 90 (2010) (citations omitted). Our colleagues on the Court of Special Appeals summarized the duty of good faith and fair dealing as "simply prohibit[ing] one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Parker v. Columbia Bank,* 91 Md.App. 346, 367, 604 A.2d 521, 531 (1992) (citing *Automatic Laundry Serv. v. Demas,* 216 Md. 544, 141 A.2d 497 (1958)). This observation, however, may be under-inclusive of the array of the potential

applications of the doctrine of the implied covenant of good faith and fair dealing. *See Clancy v. King*, 405 Md. 541, 566, 954 A.2d 1092 (2008) (citing *Chodos v. W. Publ. Co.*, 292 F.3d 992, 997 (9th Cir.Cal.2002)) (citations omitted). Absent special circumstances, however, no new obligations on the parties are imposed, where the contract is silent, by the implied covenant of good faith and fair dealing. *Blondell*, 413 Md. at 114, 991 A.2d at 90 (citing dicta from *East. Shore Mkts., Inc. v. J.D. Assocs., Ltd.*, 213 F.3d 175, 182–84 (4th Cir.2000)).

 As a threshold matter, we must decide whether a contractual relationship existed between Appellants and assignee Appellees at the operative times. Appellants maintain that because the SMLL has a special 12–year statute of limitations period, the contractual obligations between the parties somehow extend through the time of the demands for copies of the closing documentation. This argument finds no support in Maryland law. When Appellees recorded the certificates of satisfaction, the underlying mortgages or deeds of trust were released and the contractual obligations of the parties concluded. Outside of an express and surviving undertaking in the loan agreement, there is no basis to require assignees of secondary mortgage loans to retain documents. Although it may be a sound business and risk management practice to retain such documents to protect against potential claims, it is not required of Maryland law and we shall not recognize such a duty here.

As the contractual relationships ended prior to Appellants' requests for documents, there was no continuing duty, implied or otherwise, for Appellees to perform obligations under the contract. Even if there were a continuing contractual relationship, the implied duty of good faith and fair dealing may not be stretched to embrace a new obligation that requires specific record keeping and document production for all original lenders or their assignees of secondary mortgage loans. Appellants' complaints failed to allege specific facts that proved a breach of contract, instead offering only conclusory statements and general averments. We conclude that there

was no contractual obligation on behalf of Appellees to provide documents to Appellants where the secondary mortgage loans were satisfied (in some cases up to 12 years prior to the demand for production of copies of the documents), and therefore, the pertinent counts in the complaints were dismissed properly.

 Under the CPA, "a person may not engage in any unfair or deceptive trade practice" while engaged in: the sale, offer for sale, lease, rental, loan, or bailment of "any consumer goods, consumer realty, or consumer services"; the "extension of consumer credit"; or "the collection of consumer debts." § 13–303. Appellants allege Appellees engaged in unfair or deceptive trade practices described in §§ 13–301(3) & (9). Section 13–301(3) prohibits failure "to state a material fact if the failure deceives or tends to deceive." Section 13–301(9) prohibits, in relevant part, "deception, fraud, false pretenses, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same. . . ." The complaints allege that Appellees engaged in a pattern of deceptive conduct by failing to provide copies of requested loan documents, therefore preventing Appellants from discovering and proving possible SMLL violations.

As a threshold matter, Appellees were not engaged with Appellants in any of the covered activities in § 13–303 when the documents were requested. As discussed *supra,* the contractual relationship that enabled Appellees to collect the debts from Appellants concluded when the certificates of satisfaction were recorded. There was no failure to state a material fact that "deceives or tends to deceive"; rather, Appellees refused to provide additional copies of loan documents to Appellants, which documents had been received presumedly by Appellants at the closing with the original lenders of their secondary mortgage loans. Appellees' refusal had no tendency to deceive as they believed their contractual obligations to Appellants were fulfilled. The complaints failed also to allege that Appellees had any intention that Appellants

would rely on any "knowing concealment, suppression, or omission" of material facts. The complaints in this respect seek to create a cause of action from an entirely new bolt of cloth or, put in another apt cliched metaphor, attempt to force a square peg into a round hole.

 Appellants failed also to allege sufficiently that they suffered an actual injury. Maryland law requires CPA claimants to show "they were actually injured by [the defendant's] violation of the [CPA]." *DeReggi Constr. Co. v. Mate*, 130 Md.App. 648, 665, 747 A.2d 743, 752 (2000); *see also Citara-Manis v. Hallowell*, 328 Md. 142, 151, 613 A.2d 964, 968 (1992) ("It is manifest from the language employed in § 13–408(a) that the General Assembly intended that a plaintiff pursuing a private action under the CPA prove actual 'injury or loss sustained.' "). Appellants' sole assertion is that they were unable to determine definitely whether SMLL violations occurred in their closings. This, at best, is a conjectural or potential injury, far from the "actual" injury required by the CPA. Therefore, we conclude that the CPA counts fail to state a claim upon which relief can be granted and were dismissed properly.

 In Maryland, a claim for an accounting is available when "one party is under obligation to pay money to another based on facts and records that are known and kept exclusively by the party to whom the obligation is owed, or where there is a fiduciary relationship between the parties...." *P.V. Props., Inc. v. Rock Creek Village Assocs. Ltd. P'ship*, 77 Md.App. 77, 89, 549 A.2d 403, 409 (1988) (citing, among other cases, *Gianakos v. Magiros*, 238 Md. 178, 208 A.2d 718 (1965); *Dormay Const. Corp. v. Doric Co.*, 221 Md. 145, 156 A.2d 632 (1959); *Nagel v. Todd*, 185 Md. 512, 45 A.2d 326 (1946)). When the complaints were filed in the present litigation, there was no current obligation on the part of Appellants to pay money to Appellees. Even when Appellees owed money to Appellants, the mortgage loan documents were not kept and held by Appellees exclusively, unless one considers the loss or destruction by Appellants of their copies as creating this

situation de facto. Appellees do not allege that they did not receive copies of the loan documents at closing. Appellants simply did not retain the documents they sought later. We have said that "[t]he butcher, the baker and the candle-stick maker do not occupy a fiduciary relation toward every customer who has too much faith in human nature or is too busy or too careless (whichever way he may properly be characterized) to count his change." *Johnson v. Bugle Coat, Apron & Linen Serv.*, 191 Md. 268, 276–77, 60 A.2d 686, 689 (1948). That is the case here. We shall not require, as a matter of law, that assignees of secondary mortgage loans provide a record-keeping service for many years after the contractual obligation to pay money has been concluded, simply because borrowers failed to maintain their own records.

Maryland law is cautious in creating fiduciary obligations between banks and borrowers, absent special circumstances. *Parker*, 91 Md.App. at 369, 604 A.2d at 532 (citing *Yousef v. Trustbank Sav., F.S.B.*, 81 Md.App. 527, 536, 568 A.2d 1134, 1138 (1990)) (stating that there is a "long-standing principle of Maryland law that the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between a debtor and a creditor, and is not fiduciary in nature"). In *Parker*, the Court of Special Appeals described four circumstances where special conditions may exist that create a fiduciary relationship, including where the lender: "(1) took on any extra services on behalf of [the borrowers] other than furnishing ... money ...; (2) received a greater economic benefit from the transaction other than the normal mortgage; (3) exercised extensive control ...; or (4) was asked by [the borrowers] if there were any lien actions pending." 91 Md.App. at 370–71, 604 A.2d at 533. Appellants alleged none of the *Parker* special circumstances (or any other conditions) that would transmute the relationship between the parties here from the contractual relationship established to a fiduciary relationship. Even if Appellants had alleged sufficiently a fiduciary relationship between the parties over the term of the loan agreement, that relationship expired long ago. The claims for an accounting were dismissed properly.

JUDGMENTS OF THE CIRCUIT COURTS FOR BAL-
TIMORE CITY AND ANNE ARUNDEL COUNTY AF-
FIRMED. COSTS TO BE PAID BY APPELLANTS IN
THEIR RESPECTIVE CASES.