**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1166

1899 HOLDINGS, LLC; STANLEY KEYSER; KEYSER DEVELOPMENT
CORPORATION; KEYSCO REALTY CORPORATION; QUEEN ANNE
BELVEDERE REVITALIZATION LIMITED PARTNERSHIP;
NINETEEN/TWENTY-ONE WEST PRESTON, LLC; IMDBOSS, LLC,

　　　　　　Plaintiffs – Appellants,

　　　　v.

1899 LIMITED LIABILITY COMPANY; SMALL DEAL FUND, LP; 1899
SPECIAL MEMBER, LLC; RALEIGH CONSULTANTS, LLC,

　　　　　　Defendants – Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.　　Catherine C. Blake, District Judge.
(1:12-cv-00297-CCB)

Argued:　January 28, 2014　　　　　Decided:　April 24, 2014

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion.　Judge Diaz wrote the opinion,
in which Judge Wilkinson and Judge Keenan joined.

**ARGUED**: Meighan Griffin Burton, WRIGHT, CONSTABLE & SKEEN, LLP,
Baltimore, Maryland, for Appellants.　Paul S. Caiola, GALLAGHER
EVELIUS & JONES LLP, Baltimore, Maryland, for Appellees.　**ON
BRIEF**: Michael I. Gordon, Robert Hesselbacher, WRIGHT, CONSTABLE
& SKEEN, LLP, Baltimore, Maryland, for Appellants.　Brian T.

Tucker, Steven G. Metzger, GALLAGHER EVELIUS & JONES LLP, Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

In this case, we consider whether Appellants, Plaintiffs below, have adequately alleged claims for breach of contract and other state-law causes of action against several of their co-participants in a project to restore and redevelop Baltimore's Northern District Police Station. Finding that Plaintiffs had failed to state any viable claims, the district court dismissed their complaint. For the reasons that follow, we affirm.

I.

A.

In 2001, Stanley Keyser and Wendy Blair formed a Maryland limited liability company called 1899 LLC (the "Company"). Initially, 1899 LLC had two members: Keyser Development Corp., controlled by Keyser, and W.L. Blair Development LLC, controlled by Blair. Through the Company, Keyser and Blair planned to purchase Baltimore's Northern District Police Station and convert it into a commercial development. In doing so, they sought to obtain certain state and federal tax credits available for projects involving the restoration of historic buildings.

The project quickly ran into obstacles. Environmental hazards, among other difficulties, increased development costs beyond what Keyser and Blair had anticipated. To ensure adequate financing in the face of these problems, Keyser, along

3

with several entities controlled by or affiliated with him (collectively, the "Keyser entities"),[1] began contributing funds to 1899 LLC. These investments continued for several years, and by 2008, Keyser and the Keyser entities had contributed at least $3 million.

In 2005, to secure still additional financing for the project, Keyser negotiated an agreement with John Bowman, Jr., the president of an investment firm called Tax Credit Capital, LLC. Keyser and Bowman eventually agreed that Small Deal Fund L.P.--an entity affiliated with Bowman--would invest $1.9 million in the project in exchange for 99.9% of the operating profits, as well as the tax credits the project would generate. To facilitate this investment, Small Deal and 1899 Holdings, LLC (one of the Keyser entities) executed an Operating Agreement, dated January 31, 2006, through which the two firms became the sole members of 1899 LLC. The two previous members withdrew.

A number of the Operating Agreement's provisions are relevant to this appeal. First, it designated Holdings as "Managing Member" and Small Deal as "Investor Member." In essence, Holdings was responsible for day-to-day management of

---

[1] These entities included Plaintiffs-Appellants 1899 Holdings, LLC; Keyser Development Corp.; Keysco Realty Corp.; Queen Anne Belvedere Revitalization L.P.; and Nineteen/Twenty-One West Preston, LLC.

4

the project while Small Deal agreed to provide capital. Per the agreement, however, "[i]f the available debt, equity, rental income or other proceeds [were] insufficient" to complete the project, Holdings agreed to "pay such deficiencies." J.A. 152. Relatedly, Holdings warranted that it would "cause the completion of the . . . Project substantially in accordance with the plans and specifications . . . free and clear of all mechanics', materialmen's or similar liens." Id.

The Operating Agreement also specified that any financing Holdings provided to 1899 LLC would "be treated as a Capital Contribution," rather than as a loan. See id. This policy had one exception: Holdings was permitted "to make short term loans to the Company prior to Construction Completion and such loans [would] not be treated as a Capital Contribution" as long as they were repaid within 120 days (or 180 days upon substantial completion of the project). Id. at 152-53. At the time they executed the Operating Agreement, Holdings and Small Deal warranted that there were no "loans or advances . . . from the Managing Member or its Affiliates to the Company . . . outstanding for more than 120 days" (the "Warranty Clause"). Id. at 149.

The Operating Agreement gave Small Deal the power to remove Holdings as Managing Member under certain circumstances. Specifically, as relevant here, Small Deal could remove Holdings

5

if it violated (and failed to cure within thirty days) any provision of the Operating Agreement, provided that its conduct had a "material adverse effect on the Company or any of its Members." Id. at 162. An "uncured violation" of Holdings' duty to "provide funds" would be "deemed to have a material adverse effect." Id. (emphasis added).

In addition to a standard merger clause, the Operating Agreement included one other relevant provision. "For services rendered in connection with the Company's development," a developer, IMDBOSS, LLC, would receive a "Developer Fee . . . in an amount equal to 20% of appropriate development costs." Id. at 101, 160. This fee, estimated to be $500,000, would be "deemed earned in its entirety as of the date of Construction Completion." Id. at 160. The fee was to be paid "from available debt and equity proceeds of the Company, to the extent such proceeds [were] not required for other Company purposes." Id. The Operating Agreement provided that the "remainder" of the fee could be "deferred" at 6% interest, but it was "in all events" to "be [paid] by December 31, 2014."[2] Id.

After Holdings and Small Deal executed the Operating Agreement, Holdings and the other Keyser entities contributed

---

[2] The Amendment to the Operating Agreement, discussed below, would later change this date to December 31, 2017.

6

additional funding to the project, consistent with Holdings' duty to cover any shortfalls. Nevertheless, the project continued to struggle financially.

On August 12, 2008, allegedly "[a]t the insistence of Small Deal," Holdings executed an agreement on behalf of 1899 LLC with Raleigh Consultants, LLC. Id. at 30. Raleigh agreed to serve as the "day-to-day construction manager" of the project and to "perform cost data processing." Id. According to Holdings, after this agreement, it was "effectively removed" from managing the project. Id. Specifically, Holdings alleges that it repeatedly requested access to financial records and other information, but Small Deal and Raleigh "refused to respond to those requests." Id.

In September 2008, to address the project's ongoing financial difficulties, Holdings and Small Deal executed an Amendment to the Operating Agreement. Among other changes, the Amendment provided that Small Deal and another entity, the Maryland Historic Tax Credit Fund, L.P., would contribute additional capital to the project. Other than with respect to the enumerated changes, however, the Amendment stated that "the Operating Agreement is ratified and confirmed in all respects" (the "Ratification Clause"). Id. at 203.

Shortly after Holdings and Small Deal executed the Amendment, Small Deal accused Holdings of breaching its funding

7

obligation under the Operating Agreement. In a letter to Holdings, dated November 13, 2008, Small Deal threatened to remove Holdings as Managing Member, noting the existence of "no fewer than 17 liens and lawsuits directly affecting the Company." Id. at 206. In response, Holdings acknowledged that it was "unable to cause the Company to timely pay operating expenses, or payments on the Company's loans." Id. at 55. But, citing various forms of alleged misconduct by Small Deal and Raleigh, Holdings denied that Small Deal had authority to remove it as Managing Member. Undeterred, Small Deal formally removed Holdings on December 15.

As provided by the Operating Agreement, 1899 Special Member LLC--an entity appointed by Small Deal--automatically replaced Holdings. Special Member acquired Holdings' interest "for an amount equal to the greater of (i) $100 or (ii) [Holdings'] Capital Account balance . . . on the date of removal." Id. at 163. The Agreement made this sum payable to Holdings "upon the earlier of fifteen years from the date of removal or the sale of all . . . of the Company's assets." Id.

Sometime after Holdings' removal, 1899 LLC completed the project.

B.

In December 2011, Holdings, Keyser, the Keyser entities, and IMDBOSS sued 1899 LLC, Small Deal, Special Member, and

8

Raleigh in Maryland state court, asserting a variety of state-law claims. Defendants removed the action to the U.S. District Court for the District of Maryland, invoking diversity jurisdiction.

In their amended complaint, Plaintiffs first alleged that, prior to Holdings' removal as Managing Member, Bowman--on behalf of Small Deal--orally "agreed with Stanley Keyser that the outlays that had been made and would be made by [Keyser and the Keyser entities] . . . would be considered loans to 1899 LLC and not capital contributions." J.A. 32-33. As loans, the complaint explained, the funds were due immediately upon completion of the project. The complaint alleged that, by failing to repay the loans, 1899 LLC breached the terms of the oral agreement. In the alternative, the complaint sought return of the funds via claims for unjust enrichment.

The amended complaint also alleged that 1899 LLC, Small Deal, and Special Member breached the terms of the Operating Agreement by wrongfully removing Holdings as Managing Member. According to Holding, the removal was not authorized by the Agreement and violated Defendants' fiduciary duties and duty of good faith. Additionally, the complaint alleged that Defendants breached the Operating Agreement by wrongfully withholding IMDBOSS's developer fee. Finally, it requested that Defendants

9

provide "a full accounting of the Project's capital accounts, income, disbursements, distributions and finances." Id. at 39.

Defendants filed a motion to dismiss, which the district court granted. See 1899 Holdings, LLC v. 1889 Ltd. Liab. Co., No. CCB-12-297, 2013 WL 142303 (D. Md. Jan. 8, 2013). The court first held that the parol evidence rule barred Plaintiffs' loan claims. According to the court, Plaintiffs' counsel had conceded that the alleged oral agreement to treat the contributions as loans took place prior to execution of the Amendment. Moreover, the court determined that the existence of the loans was inconsistent with the terms of the Operating Agreement, as ratified by the Amendment. Because the parol evidence rule bars evidence of a prior agreement that conflicts with the terms of a written instrument, the court held that the loan-related contract allegations failed to state a plausible claim. Relatedly, the court dismissed the alternative unjust enrichment claims. It explained that such claims cannot lie where an express contract--here, the Operating Agreement and Amendment--"covers the subject matter of the claim." Id. at *4.

Second, with respect to Plaintiffs' claim for an accounting, the district court noted that "a demand for an accounting is generally not an independent cause of action in Maryland, but rather a remedy to another cause of action." Id. Having already concluded that the loan claims were not viable,

10

the court determined that the claim for an accounting also failed.

Third, the court held that Holdings had failed to plausibly allege a breach of contract based on its removal as Managing Member. Taking judicial notice of state court documents indicating the entry of judgments on liens against the project, the court determined that Holdings had violated its duty "to cause completion of the project free from liens." Id. at *5. Accordingly, the court held that "removal of Holdings as Managing Member complied with . . . the Operating Agreement." Id.

Finally, the court dismissed IMDBOSS's claim for the developer fee without prejudice. The court read the relevant provisions as establishing that the fee was not due until 2017, and thus determined that IMDBOSS's claim for payment was premature.

Plaintiffs timely noted this appeal.

## II.

Plaintiffs argue that the district court erred in dismissing each of the claims in their amended complaint, an issue that we review de novo. See Cioca v. Rumsfeld, 720 F.3d 505, 508 (4th Cir. 2013). "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

11

true, to state a claim to relief that is plausible on its face.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In assessing the sufficiency of a plaintiff's allegations, the court may "consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (internal citation omitted). Additionally, the court "may consider matters of public record such as documents from prior state court proceedings." Walker v. Kelly, 589 F.3d 127, 139 (4th Cir. 2009).

In a contract dispute, "the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." Martin Marietta Corp. v. Int'l Telecomms. Satellite Org., 991 F.2d 94, 97 (4th Cir. 1992). Under Maryland law, "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." Calomiris v. Woods, 727 A.2d 358, 363 (Md. 1999).

## A.

We first consider whether the district court erred in dismissing Plaintiffs' loan claims pursuant to the parol evidence rule. Because we have diversity jurisdiction over this

12

case, we apply Maryland's substantive contract law. See Francis v. Allstate Ins. Co., 709 F.3d 362, 369 (4th Cir. 2013), cert. denied, 134 S. Ct. 986 (2014) ("A federal court sitting in diversity is required to apply the substantive law of the forum state, including its choice-of-law rules."); Lab. Corp. of Am. v. Hood, 911 A.2d 841, 848 (Md. 2006) (noting that Maryland courts "generally apply the law of the place where the contract was made").

Under Maryland law, the parol evidence rule "bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term." Calomiris, 727 A.2d at 361. Because "a written agreement discharges prior agreements," it "render[s] legally inoperative communications and negotiations leading up to the written contract." Id. at 361-62 (internal quotation marks omitted). Plaintiffs argue that the rule does not apply to their loan claims because: (1) the alleged oral agreement to treat their contributions as loans occurred after execution of the written Amendment; and (2) the oral agreement is not inconsistent with the terms of either the Operating Agreement or the Amendment. We reject both contentions.

1.

With respect to the timing issue, Plaintiffs point to language in their amended complaint stating that Small Deal, "on

13

numerous occasions <u>until the end of 2008</u>, . . . acknowledged, agreed to, and acquiesced in the treatment of the advances as loans." J.A. 33 (emphasis added). Because the Amendment was executed in September 2008, they argue, the loan agreement is not a "prior" or "contemporaneous" agreement susceptible to the parol evidence rule. See <u>Calomiris</u>, 727 A.2d at 361.

At the hearing on Defendants' motion to dismiss, however, the district court remarked that the conversations relating to the alleged loan agreement took place "sometime in the spring and summer of 2008, after the [Operating Agreement], but prior to the [Amendment]." J.A. 279. In response to this observation, Plaintiffs' counsel stated that the conversations "were certainly after [the Operating Agreement], yes, and before the [Amendment]." <u>Id.</u> In its order dismissing Plaintiffs' claims, the district court treated this statement as an admission. In the court's view, Plaintiffs had "concede[d] that the alleged agreement . . . preceded the written Amendment." <u>1899 Holdings</u>, 2013 WL 142303, at *4.

"[A] lawyer's statements may constitute a binding admission of a party" if the statements are "'deliberate, clear, and unambiguous.'" <u>Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty.</u>, 608 F.3d 183, 190 (4th Cir. 2010) (quoting <u>Meyer v. Berkshire Life Ins. Co.</u>, 372 F.3d 261, 265 n.2 (4th Cir. 2004)). When the district court treats a statement as an

14

admission, we review that determination only for abuse of discretion.  See Meyer, 372 F.3d at 264.

On appeal, Plaintiffs contend that their counsel's statement did not carry the significance the district court attributed to it.  They argue that "counsel was referring [only] to the initial agreement to treat the advances as loans," not any further conversation confirming that agreement.  Reply Br. at 26.  We find this distinction unpersuasive.

In the colloquy, the court referred to "conversations," in the plural form, indicating it had in mind all of the discussions regarding the loans, not just the initial agreement.  In response, counsel neither disputed the court's characterization of the conversations, nor made the distinction on which Plaintiffs now rely.  That counsel did not do so is telling: as the court's observation was clearly directed to the issue of whether the parol evidence rule barred Plaintiffs' claims, counsel's failure to mention the distinction likely indicates he had no such distinction in mind.  Moreover, counsel himself employed a plural pronoun, and he phrased his statement in definitive terms.  See J.A. 279 ("They [the conversations] were certainly . . . before the [Amendment]." (emphasis added)).

Accordingly, we find both that the statement was sufficiently clear and that the district court correctly interpreted it.  We thus hold that the court's treatment of

counsel's statement as an admission was not an abuse of discretion. Because Plaintiffs are bound by the admission on appeal, see, e.g., In re McNallen, 62 F.3d 619, 625 (4th Cir. 1995), we reject their argument that the loan agreement postdated the written Amendment.

2.

Plaintiffs also contend that the alleged loan agreement is consistent with the Operating Agreement and Amendment. Because it does not "vary" or "contradict" the terms of the written instruments, they argue, the parol evidence rule does not apply. See Calomiris, 727 A.2d at 361.

The district court found that the oral loan agreement was inconsistent with the terms of the writings based on the interaction between two clauses therein: the Warranty Clause in the Operating Agreement and the Ratification Clause in the Amendment. According to the district court, by ratifying the Operating Agreement in the Amendment, Holdings effectively agreed--as of the date of the Amendment--that there were no "outstanding loans or advances" from Holdings to 1899 LLC. See 1899 Holdings, 2013 WL 142303, at *3. Holdings' allegation regarding the oral loan agreement, the court held, thus "directly contradicts the plain language of the later written Operating Agreement and its Amendment." Id.

16

Plaintiffs assert that the district court erred by selectively quoting the language of the Warranty Clause. As they point out, the full clause states that "[t]here are no outstanding loans or advances (<u>excluding</u>, for this purpose, any loans pursuant to Section 6.11 and <u>development advances</u> with respect to the Project) . . . which are <u>outstanding for more than 120 days</u>." See J.A. 149 (emphasis added). Based on this language, Plaintiffs contend that the existence of the loans is in fact consistent with the Warranty Clause in two potential ways: first, if the loans constitute "development advances" (a term that neither the Amendment nor the Operating Agreement defines); and second, if they were outstanding for fewer than 120 days at the time the parties executed the Amendment.[3]

Even if the alleged loans are potentially consistent with the Warranty Clause, however, they are nevertheless inconsistent with other provisions of the Operating Agreement. The Operating Agreement explicitly provides that any payments made by Holdings to "acquire and complete . . . the project" will "be treated as a Capital Contribution to the Company."[4]  Id. at 152. The only

---

[3] Plaintiffs do not argue that the alleged loans were "loans pursuant to Section 6.11."

[4] Plaintiffs concede that "the amounts advanced by Keyser and his entities were, in substance, monies paid into the Project by Holdings." See Appellants' Br. at 38.

17

exception to this rule is for "short-term loans," which avoid classification as capital contributions only if they are repaid "within 120 days of being made (or, within 180 days of being made upon substantial completion of construction of the Project)." See id. at 152-53. Plaintiffs do not dispute that the contributions in question were for the purpose of funding and completing the project. Nor do they dispute that the contributions were not in fact repaid within even 180 days. Consequently, the Operating Agreement (which the Amendment ratified) unambiguously renders the payments capital contributions.[5]

In any event, the Operating Agreement also contains a merger clause. That clause provides that the "written agreements . . . constitute the entire agreement among the parties and supersede any prior agreements or understandings among them." Id. at 176. Because the Amendment ratified this provision after the date of the alleged oral agreement, it leaves no room for treating the payments as loans.

---

[5] This is no less true of the so-called "Orlo loan," which the amended complaint describes as "a $500,000 loan that Stanley Keyser personally obtained from Orlo Holding NY, LLC." J.A. 33 (emphasis added). Although the Amendment notes the existence of the loan, it imposes no express duty on 1899 LLC to repay it. If, as the complaint alleges, Keyser paid the proceeds of the Orlo loan into the project, the Operating Agreement renders that payment a capital contribution.

18

In sum, the oral communications on which Plaintiffs rely contradict the parties' subsequent written agreement. As the parol evidence rule thus bars introduction of those communications as evidence, the district court did not err in dismissing Plaintiffs' loan-related contract claims.

3.

From this conclusion, it follows that the district court also correctly dismissed Plaintiffs' unjust enrichment claims. As the district court recognized, Maryland law does not permit a claim for unjust enrichment where an express contract governs. See Cnty. Comm'rs v. J. Roland Dashiell & Sons, Inc., 747 A.2d 600, 607-08 (Md. 2000). "This rule," the Maryland Court of Appeals has explained, "holds the contract parties to their agreement and prevents a party who made a bad business decision from asking the court to restore his expectations." Id. at 610 (internal quotation marks omitted).

Here, the parties agreed--by way of the Operating Agreement and Amendment--that Plaintiffs' payments to 1899 LLC would be capital contributions rather than loans. That agreement, as the only one that is both "valid and enforceable," thus "precludes recovery in quasi contract [i.e., unjust enrichment] for events arising out of the same subject matter." See MacDraw, Inc. v. CIT Group Equip. Fin., Inc., 157 F.3d 956, 964 (2d Cir. 1998) (per curiam) (alteration in original) (internal quotation marks

19

omitted) (quoted in <u>Cnty. Comm'rs</u>, 747 A.2d at 607). For this reason, Plaintiffs' unjust enrichment claims fail.[6]

B.

Next, we address Holdings' claim for breach of contract based on its removal as Managing Member of 1899 LLC. Holdings makes two arguments for why its removal was not authorized by the Operating Agreement. First, it argues that the Operating Agreement required it only to <u>complete</u> the project "free and clear" of liens, such that the existence of liens prior to completion did not violate its obligations. <u>See</u> J.A. 152. Second, Holdings argues that even if it did violate the Operating Agreement, that violation might not have had a "material adverse effect on the Company." <u>See</u> <u>id.</u> at 162.

Holdings' arguments misapprehend the contractual hook on which its removal was justified. Under the Agreement, it was not the existence of the liens themselves that justified Holdings' removal, but rather what the liens signified: that Holdings was not meeting its contractual obligation to cover shortfalls in funding. <u>See</u> <u>id.</u> at 152 ("If the available . . .

---

[6] In <u>County Commissioners</u>, the Maryland Court of Appeals recognized a variety of exceptions to the general rule. These include situations involving "evidence of fraud or bad faith," where "there has been a breach . . . or a mutual re[s]cission of the contract, when re[s]cission is warranted, or when the express contract does not fully address a subject matter." 747 A.2d at 609. None of the exceptions apply here.

proceeds are insufficient to . . . acquire and complete the rehabilitation of the Project and satisfy all other obligations . . . the Managing Member shall be responsible for and obligated to pay such deficiencies . . . ."). To this point, we note that the state court documents in the record (of which we take judicial notice) reveal not merely liens against the project, but actual judgments on those liens. Simply put, the existence of such judgments is inconsistent with Holdings having fulfilled its contractual duty.[7] In turn, the Operating Agreement provides that Holdings' failure to fulfill its funding obligation is "deemed to have a material adverse effect." Id. at 162 (emphasis added).

We perceive no ambiguity in the contract language and conclude that Holdings' removal by Small Deal was authorized by the terms of the Operating Agreement. See id. (permitting removal of Holdings as Managing Member based on an uncured violation of the Operating Agreement with a material adverse effect on 1899 LLC). Holdings has not pleaded a plausible claim for breach.[8]

---

[7] Holdings' December 11, 2008, letter to Small Deal essentially admitted as much. In the letter, Holdings stated that it was "unable to cause the Company to timely pay operating expenses, or [make] payments on the Company's loans." J.A. 55.

[8] Holdings' vague and conclusory allegations regarding bad faith and violations of fiduciary duties do not alter our (Continued)

21

C.

We next consider IMDBOSS's claim for breach of contract based on Defendants' failure to pay it the development fee. We agree with the district court that this claim is premature.

Under the terms of the Operating Agreement and Amendment, 1899 LLC is to pay IMDBOSS a "developer fee" in an "amount equal to 20% of appropriate development costs." J.A. 200. The terms of the fee's payment are as follows:

> The Developer Fee shall be deemed earned in its entirety as of the date of Construction Completion and otherwise in accordance with the terms of the Development Agreement. The Developer shall be paid such portion of the Developer Fee from available debt and equity proceeds of the Company, to the extent such proceeds are not required for other Company purposes. The remainder of the Developer Fee shall constitute a deferred fee bearing interest at 6% compounded annually, payable . . . to the Developer from Cash Flow and/or Net Proceeds[,] . . . but in all events the Deferred Developer Fee shall be [paid] by December 31, 2017 . . . .

Id. at 200-01.

_____

conclusion. See J.A. 40. We fail to comprehend how Small Deal's decision to exercise a right expressly provided to it by the contract could constitute either bad faith or a breach of fiduciary duty, especially in light of Holdings' own breach. See, e.g., Big Yank Corp. v. Liberty Mut. Fire Ins. Co., 125 F.3d 308, 313 (6th Cir. 1997) (noting that "a party's acting according to the express terms of a contract cannot be considered a breach of the duties of good faith and fair dealing" and collecting cases to that effect).

22

Focusing on this provision's pronouncement that the fee "shall be deemed earned in its entirety as of the date of Construction Completion," IMDBOSS asserts that the fee is currently due. See id. at 200. Defendants can avoid paying it, IMDBOSS argues, only by demonstrating that "there are not available debt and equity proceeds to pay the fee." Appellants' Br. at 36. As Defendants have not done so, IMDBOSS contends that 1899 LLC's failure to pay constitutes a breach of contract.

We are not persuaded by IMDBOSS's proposed construction. Although the fee was "earned" at the time that construction of the project was completed, it does not follow that the fee simultaneously became due. With respect to payment of the fee, the Amendment states only that it "shall be [paid] by December 31, 2017." J.A. 201. Until that date, the contract vests 1899 LLC with discretion to decide that the relevant funds are "required for other Company purposes." Id. at 200. While an allegation that the company is withholding payment of the fee in bad faith could perhaps overcome the discretion this clause confers on 1899 LLC, IMDBOSS makes no such allegation in the amended complaint. For that matter, the complaint does not even assert that there are "available debt and equity proceeds" to pay the fee. See id. Accordingly, we conclude that IMDBOSS has not adequately alleged that it is yet entitled to the fee. The

23

district court thus did not err in dismissing IMDBOSS's claim without prejudice.

D.

Finally, we hold that the district court correctly dismissed Plaintiffs' claim for an accounting. "In Maryland, a claim for an accounting is available when one party is under obligation to pay money to another based on facts and records that are known and kept exclusively by the party to whom the obligation is owed, or where there is a fiduciary relationship among the parties." Polek v. J.P. Morgan Chase Bank, N.A., 36 A.3d 399, 418 (Md. 2012) (internal quotation marks omitted). This case presents neither circumstance.

First, because Plaintiffs have otherwise failed to plead viable claims for breach of contract or unjust enrichment, we discern no basis for concluding that any of the defendants are under a current "obligation to pay money" to any of the plaintiffs. Although Plaintiffs' capital contributions will ultimately be subject to repayment, such repayment is not due until "the earlier of fifteen years from the date of removal or the sale of all or substantially all of the Company's assets," neither of which has yet occurred. J.A. 163.

Second, and for similar reasons, Defendants do not owe Plaintiffs a fiduciary duty. Regardless of whether members of a Maryland LLC generally owe each other fiduciary duties (an issue

24

on which the parties disagree), neither Holdings nor any other plaintiff is currently a member of 1899 LLC. Per the Operating Agreement, Special Member simply owes Holdings a fixed sum of money, payable upon one of the events noted above. See id. ("[T]he Special Member or its designee shall automatically . . . acquire the Interest of the removed Managing Member for an amount equal to the greater of (i) $100 or (ii) the Capital Account balance of the removed Managing Member on the date of removal."). In other words, the current relationship between Holdings and Special Member is merely that of a creditor and debtor; Holdings has no current relationship with 1899 LLC.

Plaintiffs therefore have not alleged circumstances to support a claim for an accounting. See Polek, 36 A.3d at 418 (affirming the dismissal of accounting claims on the basis that the contractual relationship between the parties was not fiduciary in nature and any fiduciary relationship that otherwise existed had "expired long ago").

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

25